BOARD OF TRUSTEES, SHEET METAL )
WORKERS' NATIONAL PENSION FUND, et al., )
)
                *Plaintiffs,* )
)        Civil Action No. 1:16-cv-1613
      v. )        Hon. Liam O'Grady
)
FOUR-C-AIRE, INC., )
)
                *Defendant.* )
)

## MEMORANDUM OPINION

This ERISA case comes before the Court on Defendant's motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. (Dkt. No. 20). The Amended Complaint seeks to recover for three separate categories of payments: (1) delinquent payments and audit fees from before January 2015; (2) delinquent payments and reporting violations after January 2015; and (3) an exit contribution. The parties fully briefed the matter, and the Court held oral argument on April 7, 2016. For the reasons that follow, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the motion. Specifically, the Court **DENIES** the motion to dismiss for the delinquent contributions and reporting that accrued after January 2015, but **GRANTS** the motion to dismiss for all of Count II (seeking an exit contribution) and the portion of Count I that was previously adjudicated in this Court.

## I. BACKGROUND[1]

There are six Plaintiffs in this case. They are the separate and individual Boards of Trustees of the Sheet Metal Workers' National Pension Fund ("NPF"), the International Training

---

[1] The following factual recital is drawn from the Amended Complaint and is accepted as true for the purposes of this motion.

Institute for the Sheet Metal and Air Conditioning Industry ("ITI"), the National Energy Management Institute Committee ("NEMI"), the Sheet Metal Occupational Health Institute Trust Fund ("SMOHIT"), the Sheet Metal Workers' International Association Scholarship Fund ("Scholarship Fund"), and the national Stabilization Agreement for the Sheet Metal Industry Trust Fund ("SASMI") (collectively, the "Funds" or "Plaintiffs"). The Boards of Trustees are "fiduciaries" with respect to the Funds. *See* 29 U.S.C. § 1132(a)(3). As such, under ERISA, they are empowered to bring this action on behalf of the Funds. 29 U.S.C. § 1132(g)(2) The NPF, ITI, and SASMI are jointly trusteed trust funds created and maintained under LMRA and "multiemployer plans as defined by ERISA."

Defendant is a New York corporation that qualifies as an employer within the meaning of 29 U.S.C. § 152(2) and Section 3(5) of ERISA, 29 U.S.C. § 1002(37). Until the date of its withdrawal from the Funds on or about May 1, 2016, Defendant employed individuals represented by Sheet Metal Workers International Association Local Union No. 58 (Local Union No. 58). At all times relevant to this action, Defendant was bound by a collective bargaining agreement (CBA) between the Central New York Sheet Metal Contractors' Association, Inc. and Local Union No. 58. This CBA included all addenda and is referred to as the "Labor Agreement." Under the terms of this Labor Agreement, Defendant was also obligated to abide by the terms of the Trust Agreements, *including all amendments thereto* ("Trust Documents").

Under the terms of the Labor Agreement and Trust Agreements, Defendant was obligated to "submit monthly remittance reports and pay fringe benefit contributions to the Funds for all hours worked or paid on behalf of Defendant's covered employees." Am. Compl. ¶ 12. Under these Agreements, contributions are deemed delinquent if they are past the fifteenth day of the month.

2

## A.     Procedural History

The Funds previously filed suit against Defendant in this Court in case number 1:15-cv-105-LMB-JFA ("Prior Litigation"). The Prior Litigation sought to recover unpaid contributions from November and December 2014, among other things. On June 5, 2015, the case terminated in a default judgment against Defendant. (Prior Litigation, Dkt. No. 19).

Plaintiffs filed their original complaint in this case on December 29, 2016. On February 14, 2017, Defendant filed a motion to dismiss. (Dkt. No. 11). Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs filed an amended complaint on February 27, 2017. (Dkt. No. 18). In light of Plaintiffs' Amended Complaint, Defendant's original motion to dismiss was denied as moot, and Defendant then filed the instant motion to dismiss (Dkt. No. 20).

## B.     Alleged Delinquent Payments

After the Prior Litigation, Plaintiffs conducted a payroll audit of Defendant for the work months of May 2014 through March 2015. The audit revealed that, for December 2014, Defendant owed $282.56 more than the Funds received through their default judgment award. The corresponding audit fees were $1,600. Under the Funds' "Procedure for the Collection of Contributions," Defendant is bound to pay the delinquency as well as the audit fee.

Defendant also failed to make contributions during the months of January through April 2016. From February to April 2016, Defendant failed to submit monthly reports as well. Plaintiffs estimate that Defendant owes at least $9,734.40 in contributions for the time period of January through April 2016.

Moreover, Defendant's contributions for the months of January 2015 to September 2015 were delinquent when paid. Plaintiffs assert that all of these delinquent payments amount to a violation of Section 515 of ERISA. As such, Plaintiffs seek the following remedies for these

delinquent contributions: (1) interest at the rate of 0.0233% per day; (2) if not interest, then liquidated damages equal to 20% of the delinquent contributions; (3) attorneys' fees; (4) late fees amounting to the greater of 10% of the delinquent contributions or $50.00.

### C.    **Alleged Exit Contribution**

Article V, Section 6(a) of the Sheet Metal Workers' National Pension Fund Trust Document ("NPF Trust Document") imposes an "exit contribution" on any employer who (1) ceased to have an obligation to contribute to the NPF Trust, and (2) had an event of withdrawal under Title IV of ERISA as a result of the cessation of its obligation to contribute, but was not required to pay withdrawal liability. Am. Compl. ¶ 39. Under this provision, the employer shall pay the exit contribution so long as a new CBA is not executed after its CBA expires. *Id.* ¶ 40. The amount of the exit contribution is equal to the amount of the employer's contributions for a 36-month period prior to the month in which the employer ceased to have an obligation to contribute to the fund. It is due no later than the twentieth day of the month following the Fund's demand for an exit contribution. *Id.* ¶ 42. Plaintiffs allege that "an Employer's failure to make an Exit Contribution constitutes a delinquency and is treated in the same manner as any other delinquent contribution." *Id.* ¶ 43.

On October 15, 2015, the NPF Trust Document "was amended" to include the following language:

> By agreeing to contribute, continuing to contribute, or continuing to be obligated to contribute, to the Fund, each Employer agrees to pay an Exit Contribution in accordance with this Section 6. The Employer's obligation to pay an Exit Contribution under this Section 6 is independent of the Employer's collective bargaining agreement and continues to apply after the termination of the collective bargaining agreement (notwithstanding any language to the contrary in the collective bargaining agreement).

4

*Id.* ¶ 44 (quoting NPF Trust Document Art. V. § 6(b)). Because the Labor Agreement expressly incorporated the Trust Document, Plaintiffs allege that Defendant was bound to the terms of the amendment, which on its face survived the termination of the Labor Agreement.

Defendant's Labor Agreement expired on April 30, 2016. On August 5, 2016, the NPF Trust assessed an exit contribution against Defendant and demanded payment by September 20, 2016. Based on the contribution history, the amount of the exit contribution was $97,601.01. To date, Defendant has not made this payment.

Accordingly, Plaintiffs seek the following remedies for the delinquent exit contribution: (1) interest at the rate of 0.0233% per day (at least $3,506.02); (2) an amount equal to the greater of interest calculated at the above rate or liquidated damages equal to 20% of the delinquent contributions (at least $19,520.02); and (3) attorneys' fees.

## II. LEGAL STANDARD

In considering a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, construing them in the light most favorable to the plaintiff. *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). To defeat the motion, the Plaintiff must allege enough allegations of fact "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In this regard, bald legal assertions without factual support need not be accepted. *Id.* Indeed, the Court may not rely on mere "labels and conclusions" or the Complaint's "formulaic recitation of the elements of a given cause of action in deciding the motion. *Id.* at 555. In conducting its analysis, the Court may take judicial notice of matters of public record and may also consider documents attached to the complaint, "as well as those attached to the motion to dismiss, so long

as they are integral to the complaint and authentic." *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III. DISCUSSION

There are two counts alleged in the amended complaint: Count I alleges delinquent contributions, and Count II alleges liability for an exit contribution imposed by the NPF Trust. Both of these Counts allegedly arise under § 515 of ERISA, which provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. The relevant enforcement provisions are contained in 29 U.S.C. § 1132, which allows for specific remedies in claims brought by the fiduciaries of eligible plans. *See* 29 U.S.C. § 1132(g)(2). The two counts will be addressed in turn.

### A.    **Count I: Delinquent Contributions**

Count I can be broken into two separate legal questions. First, does the doctrine of *res judicata* bar the recovery of delinquent payments prior to January 2015? The answer to this question is the subject of a circuit split. After considering the relevant caselaw, the Court concludes that the doctrine of claim preclusion bars these claims.

Second, does the amended complaint plead sufficient facts under Rule 8 to show that Defendant owed additional delinquent payments outside the date range covered by the Prior Litigation? The answer to this question is a straightforward "yes". As such, the motion to dismiss is hereby **GRANTED IN PART** and **DENIED IN PART** as it applies to Count I. Specifically, it is **GRANTED** for the claims that arose prior to January 2015, but **DENIED** as to the subsequent claims.

6

1.    *Res Judiciata*

The term *res judicata* encompasses two distinct legal concepts: (1) claim preclusion; and

(2) issue preclusion, often referred to as "collateral estoppel."[2] *Orca Yachts, L.L.C. v. Mollicam,*

*Inc.*, 287 F.3d 316, 318 (4th Cir. 2002). Claim preclusion provides generally that, "if the later

litigation arises from the same cause of action as the first, then the judgment in the prior action

bars litigation not only of every matter actually adjudicated in the earlier case, but also of every

claim that might have been presented." *Orca Yachts, L.L.C. v. Mollicam, Inc.*, 287 F.3d 316, 318

(4th Cir. 2002) (internal quotations and citations omitted). In order to establish claim preclusion,

the Defendant must show that: (1) the prior judgment was final and on the merits; (2) the parties

are identical or in privity; and (3) "the claims in the second matter are based upon the same cause

of action involved in the earlier proceeding." *Pittston Co. v. United States*, 199 F.3d 694, 704

(4th Cir. 1999) (quoting *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986)). For claim

preclusion purposes, a default judgment qualifies as a final judgment on the merits. *Orca Yachts*,

287 F.3d at 319.

Determining the appropriate scope of a previous order's preclusive effect is not always an

easy task, and different "tests" have developed to determine whether causes of action or claims

are the same for preclusion purposes. *See* Francis C. Amendola, et al., 49 C.J.S. Judgments

§ 986 (West 2017) (discussing the "primary right and duty" test, the "same evidence" test and

the "transactional" test). The Fourth Circuit appears to follow the "transactional" test for claim

preclusion. *See Pittston*, 199 F.3d at 704; *see also* Restatement (Second) of Judgments § 24; *but*

*see Nash Cty. Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir. 1981) (listing the "identity

---

[2] For issue preclusion to apply, the relevant issue must have been "actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979). Because the "first action" in this case was a default judgment in which the Defendant did not make an appearance and did not "actually litigate" the issue of delinquent payments, only claim preclusion is at issue here.

7

of the cause of action in both the earlier and the later suit" as a necessary element of claim

preclusion). The key inquiry for the "transactional" test is whether the two cases arise from "a

common nucleus of operative fact." *Mason v. Richmond Motor Co.*, 625 F. Supp. 883, 885 (E.D.

Va. 1986), *aff'd,* 825 F.2d 407 (4th Cir. 1987). Thus, the Court should consider, among other

things, "whether the facts of the current and prior claims are so woven together that they

constitute a single claim are their relatedness in time, space, origin, or motivation, and whether,

taken together, they form a convenient unit for trial purposes." *Pittston*, 199 F.3d at 704

(internal citations and quotation marks omitted).

> 2. *Circuit Split*

The application of these principles has caused a circuit split in ERISA cases brought

under 29 U.S.C. § 1145. In opposing this motion, Plaintiffs rely heavily on a 1983 case from the

D.C. Circuit. *I.A.M. Nat. Pension Fund, Ben. Plan A v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 945

(D.C. Cir. 1983) (hereinafter "*Industrial Gear*"). In *Industrial Gear*, the Pension Fund initially

brought suit against the employer for failing to submit timely reports and for failing to make the

contributions required under the operative CBA. *Id.* That cause of action was settled by a

consent decree that required the employer to pay contributions deemed to be due by a prior audit.

*Id.* at 946. A few years later, however, the Fund conducted a second audit which revealed that

the employer "again had failed to make certain required contributions to the Fund." *Id.*

Although the relevant time periods in the two cases overlapped, the court found that the doctrine

of claim preclusion did not apply. *Id.* at 948.

The court reasoned that the two causes of action were distinct because, while the first

case "involved the *delinquency* of the reports and payments for the period in question . . . the

latter case was concerned with the *accuracy* of those reports and payments." *Id.* at 947.

Underlying this conclusion was the fact that the "the Pension Fund [was] separate from both the [employer] and the Union." *Id.* Accordingly, "[b]efore the Fund can maintain a cause of action alleging inaccurate contributions, it must conduct an audit from which it determines that the monthly reports are inaccurate." *Id.* As such, under *Industrial Gear*, the act of conducting an audit was a significant event that essentially created a new cause of action.

At least one district court outside of the District of Columbia has purported to apply the "transactional" test and agreed with the outcome in *Industrial Gear*. *Cent. States, Se. & Sw. Areas Pension Fund v. Plymouth Concrete, Inc.*, 803 F. Supp. 169, 170 (N.D. Ill. 1992) (hereinafter "*Plymouth Concrete*"). When confronted with the same circuit split, the *Plymouth Concrete* court emphasized that applying the doctrine of claim preclusion in the context of an employer fund would "overlook[] the realities dictating the operations of modern day pension funds" because the funds have "no independent knowledge with which to verify the accuracy of the information supplied by the employer." *Id.* at 172.

On the other hand, the Ninth Circuit, Tenth Circuit, and a significant number of district courts in the Second Circuit have all reached the opposite conclusion. *See Int'l Union of Operating Engineers-Employers Const. Indus. Pension, Welfare & Training Trust Funds v. Karr*, 994 F.2d 1426, 1427 (9th Cir. 1993); *May v. Parker–Abbott Transfer and Storage, Inc.*, 899 F.2d 1007 (10th Cir. 1990); *King v. Galluzzo Equip. & Excavating, Inc.*, No. 00 CV 6247 (ILG), 2001 WL 1402996, at *7 (E.D.N.Y. Nov. 8, 2001) (collecting district court cases in the Second Circuit). The court in *King* synthesized this line of cases. First, *King* noted that *Industrial Gear* did not apply the broader "transactional" test that has emerged as the majority approach in the federal courts.[3] *King*, 2001 WL 1402996 at *8 (discussing *Industrial Gear*). Next, the court

---

[3] In *Industrial Gear*, the D.C. Circuit acknowledged the "primary right" test and the "identity of the cause of action" test, but declined to explicitly accept either one. *Industrial Gear*, 723 F.2d at 948.

pointed out that the right to contributions, audits, and other benefits were all derived from the same CBA that provided the factual predicate for the ERISA claims in both actions. *Id.* at *9. Finally, the court noted that "the facts supporting this new allegation arose prior to the filing of the original complaint—it was only [plaintiffs'] awareness of these facts that came later." *Id.* (internal quotation marks and citations omitted). Because of these factors, the Court determined that a later audit did not affect the preclusive effect of a previous case dealing with delinquent contributions for the same time periods.

In considering these issues, the Court declines to apply *Industrial Gear* and instead follows the countervailing trend of caselaw in the Second, Ninth, and Tenth Circuits. At its core, the doctrine of claim preclusion is undergirded by principles of judicial economy and finality that prevent litigants from continuing to bring needless litigation. *Parklane Hosiery*, 439 U.S. at 326; *see also Shoup v. Bell & Howell*, 872 F.2d 1178, 1182 (4th Cir. 1989) (finding that claim preclusion "rests on a determination that justice is better served by attributing finality to judgments . . . than by second efforts at improved results."). In that respect, the doctrine places a burden on the plaintiff to bring all of their claims at once rather than litigating them in a piecemeal fashion.

Plaintiffs nonetheless argue that, "[i]t was only as a result of the audit subsequent to the Prior Litigation that the Funds learned Defendant owed additional contributions beyond what the Funds had been forced to estimate [the amount of the contributions] due to Defendant's failure to submit contribution reports and failure to appear in the Prior Litigation." Opp'n at 8. They further argue that, even if claim preclusion applies to the excess delinquent fees of $256.56, it cannot apply to the $1,600 in audit fees because the Funds incurred these fees *after* the final

judgment in the Prior Litigation. As such, they argue that Defendant "did not even become liable until after the audit was completed in 2016." *Id.*

These arguments are unconvincing. Plaintiffs' claims arise out of the *same* CBA, cover the *same* period of time, are between the *same* parties, and concern the *same* type of contribution payments to the *same* plan. Nearly everything about the two claims is identical. The only real difference between the claims is the fact that Plaintiffs' audit revealed a discrepancy of $256.56 in the payments owed. The small size of this sum underscores the propriety of precluding Plaintiffs' claims in this case. The amount of time the parties spent briefing this issue surely does not point to an efficient use of their resources. Nor is it an efficient use of the Court's resources, particularly when these issues could have been raised and resolved in 2015 when the case originally came before the court.

Along these lines, Plaintiffs do not set forth any reason that they could not have audited Defendant's records *before* bringing suit in the first instance. Indeed, that is the practical outcome of rejecting *Industrial Gear* and its progeny. Under the Tenth Circuit's rule, prospective plaintiffs are simply incentivized to conduct an audit before they bring a lawsuit. In fact, the process appears to be simple: if the employers are not providing detailed reports along with their contributions, the Funds should conduct an audit. If that audit reveals improper or insufficient payments, the employer should pay the difference, along with any fees or costs under the terms of the CBA. As a corollary, unions have the ability to negotiate and contract for periodic audits or other accounting procedures in their CBAs in the first instance, thereby obviating the need for this sort of dispute. As such, applying the "transaction" test for claim preclusion, the Court finds that Plaintiffs' claims for contributions before January 2015 are barred.

This conclusion applies equally to the audit payments. If Plaintiffs are to be incentivized to bring all their ripe claims at one time, then they must also be prompted to do the requisite work before bringing their claims. Again, there was no apparent barrier to Plaintiffs conducting their audit *before* bringing their claims. Indeed, that is exactly what they did when they filed this case. As such, allowing for the recovery of audit fees that have accrued after a final judgment would undercut the reasoning supporting the analysis above. Moreover, the audit fees similarly arose from the same contract between the same parties, for the same period of time, and revolved around the same type of contributions. In other words, they are part and parcel of the same dispute and will be treated as such. Accordingly, Plaintiffs may not recover for either the delinquent payments before January 2015 or the corresponding audit fees incurred thereafter.

3.      *Delinquent Payments that Accrued After the Prior Litigation*

The issues concerning the remaining time period covered by Count I are much more straightforward, and the Court hereby holds that Plaintiffs have pled sufficient facts to show that they may recover delinquent payments for the time period after December 2014. Under the terms of the default judgment in the Prior Litigation, plaintiffs recovered "unpaid contributions due for November and December 2014, interest through April 27, 2015, liquidated damages, late fees, and attorney's fees and costs." Prior Litigation, Dkt. No. 17 at 4. This recovery was therefore separate from most of the allegations in the Amended Complaint, which stated that Defendant had failed to make contributions from January to April 2016 and had failed to submit contribution reports from February to April 2016. Compl. ¶¶ 29–31. The Amended Complaint further alleges that "Defendant's contributions for the months of January 2015 through September 2015 were delinquent when paid." *Id.* ¶ 33.

In an attempt to avoid liability for these time periods, Defendant falls back on the Rule 8 pleading standard to argue that, because "Plaintiffs do not claim covered work was actually performed . . . from January to April 2016" they therefore fail to allege sufficient facts to survive a motion to dismiss. Reply in Supp. at 5–6. This argument does not hold water.

Plaintiffs' Complaint properly asserts that: (1) Defendant was bound by a Labor Agreement that required contribution payments and periodic reporting; (2) Defendant failed to perform these obligations between January and April of 2015; (3) Defendant therefore owes the Funds approximately $9,734.40 in delinquent contributions; and (4) Plaintiffs are entitled to bring suit to collect these funds under § 515 of ERISA. Although Plaintiff could have conceivably included factual allegations regarding the amount of hours worked by Union members, those allegations are not necessary in order to bring the claims from the "possible" to the realm of the plausible. Moreover, the amount of hours worked would not have been immediately available to Plaintiffs because Defendant did not submit contribution reports for that time period. As such, under the circumstances of this contractual arrangement, the Court finds that these claims are plausible on their face. *See* 29 U.S.C. § 1145. The motion to dismiss is therefore **DENIED** as to these payments.

## B.     Count II: Exit Contributions

There are two relevant documents to consider in determining whether Plaintiffs are entitled to the exit contribution demanded under the terms of the NPF Trust. They are: (1) the CBA; and (2) the NPF Trust Document. Although the CBA is not attached to any of the parties' pleadings, a copy of the agreement was included in the Prior Litigation, and Defendant has incorporated that document by reference. There are two relevant provisions to the CBA. First is

13

the incorporation provision which binds Defendant to the terms and conditions of the Funds'

trust agreements and any amendments thereto. Am. Compl. ¶ 11.

The second relevant term is the "evergreen clause" which provides:

> This Agreement and Addenda Numbers one (1) through thirty-two (32) attached
> hereto shall become effective on the 1st day of May, 2011 and remain in full force
> and effect until the 30th day of April 2016 and shall continue in force from year to
> year thereafter unless written notice of reopening is given not less than ninety (90)
> days prior to the expiration date. In the event such notice of reopening is served,
> this Agreement shall continue in force and effect until conferences relating thereto
> have been terminated by either party by written notice, provided, however, that, **if
> this Agreement contains Article X, Section 8 [an arbitration provision], it
> shall continue in full force and effect until modified by order of the National
> Joint Adjustment Board** or until the procedures under Article X, Section 8 have
> been otherwise completed.

Mem. in Supp. at 15 (quoting Local 58 CBA, Art. XVI, § 1) (emphasis added).

The NPF Trust has not been introduced to the record by either party and is not before the

court on this motion to dismiss except for the two terms that are referenced in the Amended

Complaint. The first of these terms provides that an employer is liable for an exit contribution if

it: (1) ceased to have an obligation to contribute to the NPF, and (2) had an event of withdrawal

under Title IV of ERISA as a result of the cessation of its obligation to contribute, but was not

required to pay withdrawal liability under Title IV of ERISA. Compl. ¶ 39 (quoting NPF Trust,

Art. V, § 6). Second, on October 15, 2015, the NPF Trust was amended to provide:

> By agreeing to contribute, continuing to contribute, or continuing to be obligated
> to contribute, to the Fund, each Employer agrees to pay an Exit Contribution in
> accordance with this Section 6. *The Employer's obligation to pay an Exit
> Contribution under this Section 6 is independent of the Employer's collective
> bargaining agreement and continues to apply after the termination of the
> collective bargaining agreement (notwithstanding any language to the contrary
> in the collective bargaining agreement).*

Compl. ¶ 44 (quoting NPF Trust § 6(b)) (hereinafter "October Amendment") (emphasis added).

Defendant withdrew from the CBA on May 1, 2016 pursuant to the terms of the contract. Compl. ¶ 29. On August 5, 2016, the NPF assessed an exit contribution against Defendant under the terms of the NPF Trust Document. *Id.* The question is now whether the October Amendment to the Trust Document is valid and enforceable against Defendant, notwithstanding the facts that (1) Defendant was no longer bound by the terms of the CBA when Plaintiffs attempted to enforce the provision, and (2) the amendment was not in effect at the time Defendant signed the CBA.[4]

1.     *Analogous Cases in the Eastern District of Virginia*

The parties cite to two conflicting cases in this district that have previously dealt with the issue of an exit contribution assessed by a trust. Defendant relies on a case from 2015 which found that the obligation to pay an exit contribution under the terms of a trust document did not survive the termination of the CBA. *See Board of Trustees, Sheet Metal Workers' National Pension Fund v. Caddo Sheet Metal, LLC*, No. 1:14-cv-858, 2015 WL 4032037 (E.D. Va. 2015) (hereinafter "*Caddo*"). In *Caddo*, the Court examined a materially similar CBA[5] and concluded that, although some provisions in the CBA expressly survived termination, the imposition of the exit contribution was not one of those terms. *Id.* at *5. Moreover, the Court noted that "the Fund could have assessed the exit contribution for Caddo's non-renewal of the CBA prior to its expiration because the CBA requires Caddo to give 90 day notice." *Id.*[6]

---

[4] The parties also dispute whether the exit contribution in this case qualifies as a "contribution" under 29 U.S.C. §§ 1145 and 1132(g)(2). Because the Court finds that the October Amendment is unenforceable against Four-C-Aire, it does not reach this question.

[5] *See* Opp'n at 14–15 n.8 (comparing the termination provisions of the CBAs in the two cases).

[6] As a necessary prerequisite to that holding, the Court also rejected the argument that "the only way to harmonize the terms of the CBA and the Trust Document is to recognize the survivability of the Exit Contribution provisions because any other interpretation would render the Exit Contribution provisions meaningless." *Id.* at *4 (quoting Pl.'s Opp'n at 15). It did so because there were many cases in which an employer might cease to have an obligation to contribute to the Fund when its CBA does not expire. *Id.* (analyzing *M & G Polymers*, 135 S. Ct. at 936 ("[A] promise that is 'partly' illusory is by definition not illusory.).

On the other hand, Plaintiffs cite to a 2008 case for the proposition that the power to impose exit contributions on an employer pursuant to a Trust Agreement survives the termination of the CBA. *Bd. of Trustees, Sheet Metal Workers' National Pension Fund v. DCI Signs & Awnings, Inc.*, No. 1:08-cv-15, 2008 U.S. Dist. LEXIS 17115 (E.D. Va. 2008). In that case, the court rejected the argument that "the Trust Agreement is a 'moving and evolving target, the terms of which were unknown to Defendant, and the Defendant should not be bound by it." *Id.* at *8. Instead, the Court held that Defendant was liable for an exit contribution provided it could show that: (1) Defendant was bound to the CBA; (2) the CBA properly incorporated the Trust Agreement; and (3) the Trust Agreement legitimately imposed an exit contribution on the employer. *Id.*

2.   *Applicable Contractual Principles*

There are four contractual principles that help guide the resolution of this case. First, the Court must "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015). Applying these "ordinary principles," the Supreme Court has concluded that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 937 (quoting *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991)) (internal quotation marks omitted) (emphasis added); *see also Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) ("Employer obligations and employee rights, under a collective bargaining agreement, do not survive the expiration of the agreement absent a clear intention of the parties."). Nonetheless, "a collective bargaining agreement may provide in explicit terms that certain benefits continue after

16

the agreement's expiration." *Id.* (citing *Litton*, 501 U.S. 207) (alterations and quotation marks omitted).

Second, "[i]t is axiomatic in the law of contracts that, in order to incorporate a secondary document into a primary document, the identity of the secondary document must be readily ascertainable." *Hertz Corp. v. Zurich Am. Ins. Co.*, 496 F. Supp. 2d 668, 675 (E.D. Va. 2007). In addition, the incorporation of the secondary document must be "unambiguous, clear, specific, conspicuous, and explicit." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 519 (4th Cir. 2015). The secondary document must also be readily available to the party against whom the contract is being enforced. *See id.* Moreover, "it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship." *Covol Fuels No. 4, LLC v. Pinnacle Min. Co., LLC*, 785 F.3d 104, 114 (4th Cir. 2015) (quoting *State ex rel. U–Haul Co. of W. Va. v. Zakaib*, 232 W.Va. 432, 752 (2013)).

The third principle is the inoffensive rule that generally, "a party to a contract does not have a right to unilaterally modify the contract." *Expo Properties, LLC v. Experient, Inc.,* No. CV GLR-14-688, 2016 WL 3997290, at *7 (D. Md. July 26, 2016); *see also Kuhne v. Florida Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014). Although there may be circumstances in which unilateral modification power has been validly conferred, courts will not infer that authority "absent the clearest evidence." *Baltimore Teachers Union, Am. Fed'n of Teachers Local 340, AFL-CIO v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1016 (4th Cir. 1993) ("Given the value ascribed to contracts in our society, and the Constitution's explicit proscription on the state's impairment of contracts, we would not hold, absent the clearest evidence, that the

17

City intended to confer upon the Board of Estimates even the power unilaterally to modify the City's contracts . . .").

The fourth contractual principle flows from the third. This principle provides that, even when unilateral modification rights are explicitly granted in a contact, those clauses are often found invalid as illusory or unconscionable. *See, e.g.*, *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003) (holding that a unilateral termination or modification clause was substantively unconscionable); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 959 (N.D. Cal. 2015) (discussing how the covenant of good faith and fair dealing and the doctrine of unconscionability could invalidate a unilateral modification clause); *Carroll v. Stryker Corp.*, 658 F.3d 675, 683 (7th Cir. 2011) (discussing how unilateral modification clauses might be illusory); *Morrison v. Amway Corp.*, 517 F.3d 248, 255 (5th Cir. 2008) (invalidating unilateral modification clause because it was illusory).

The Fourth Circuit has recognized that when courts enforce unilateral modification clauses, they only do so when the clause is either procedurally or substantively limited. [7] *See Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 93 n.5 (4th Cir. 2005) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 604 (3d Cir. 2002) and *Pierce v. Kellogg Brown & Root*, 245 F.Supp.2d 1212, 1215–16 (E.D. Okla. 2003); *see also Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 478–79 (10th Cir. 2006). Without limitation, however, an "agreement allowing one party the unfettered right to alter the [] agreement's existence or its scope is illusory" and unenforceable. *Dumais v. Am. Golf*, 299 F.3d 1216, 1219 (10th Cir. 2002).

---

[7] In other ERISA contexts, when a plan administrator has unilateral authority to amend binding plan documents, the Supreme Court has highlighted the importance of establishing procedures for the amendment process. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80 (1995) (holding that "the literal terms of [29 U.S.C.] § 402(b)(3) . . . require[] only that there *be* an amendment procedure") (emphasis in original).

3.  *Analysis*

Applying these principles, the Court concludes that: (1) the CBA's incorporation clause does not survive termination; (2) the October Amendment was not properly incorporated; and (3) the NPF Trust Document's amendment procedure is illusory as alleged.  As such, the Court **GRANTS** the motion to dismiss Count II.

Plaintiffs' argument is fairly straightforward.  They argue that: (1) the CBA was duly executed; (2) the CBA expressly incorporated the Trust Document and all amendments thereto; (3) the Trust Document's October Amendment expressly declared that the exit contribution authority survived the termination of the CBA. [8]  Based on these three conclusions, they assert that Defendant is bound by the October Amendment notwithstanding its withdrawal from the CBA.

Defendant responds that a clear reading of the CBA "unambiguously demonstrates the contracting parties' intent . . . that none of the currently-relevant contractual obligations were intended to survive termination."  Reply in Supp. at 8.[9]  As such, it argues that the incorporation clause (and, by extension, the October Amendment) may not be enforced after the termination of the CBA.  In addition, Defendant suggests that traditional canons of contractual interpretation do not permit the enforcement of the October Amendment against it.

Applying the principles set forth above, the Court first concludes that the CBA's incorporation clause does not survive the contract's termination.  The Supreme Court has directed that "contractual obligations will cease, in the ordinary course, upon termination of the

_____

[8] The actual text of the CBA reads: "The parties agree to be bound by . . . the separate agreements and declarations of trusts of all other local or national programs to which it has been agreed that contributions will be made.  In addition, the parties agree to be bound by any amendments to said trust agreements as may be made from time to time . . ."  Prior Litigation, Dkt. No. 13-1 at 8.

[9] Defendant also argues that the Court should dismiss this case because Plaintiffs have failed to produce the relevant documents showing that Defendant was bound to the CBA and the NPF.  *See* Reply in Supp. at 1–2.  This argument is meritless because the Complaint properly alleges that Defendant was bound by the terms of the CBA.  *See, e.g.*, Am. Compl. ¶ 10.

*bargaining agreement.*" *M & G Polymers*, 135 S. Ct. at 933 (emphasis added). Interpreting that

precedent, this Court has explicitly held that exit contribution requirements imposed by an

incorporated trust document do not survive the termination of the CBA unless explicitly noted in

the CBA. *Caddo*, 2015 WL 4032037 at *5. The key factual difference between this case and

*Caddo* is the October Amendment, which purports to extend the terms of the NPF Trust

notwithstanding the expiration of the CBA. Thus, at least at first glance, the October

Amendment is at odds with the durational provisions of the CBA.

This tension is eased by a closer examination of *Caddo* and *M & G Polymers*, which are

clear in their focus on the bargaining agreement and not on the secondary documents. This is

logical, as the CBA gives rise to the ERISA obligations in the first place, and it is the contract

that the parties allegedly signed in this case. *See* 29 U.S.C. § 1145. Although the CBA

incorporates the Trust Documents, it does not expressly provide that the trust-related obligations

will survive the termination of the CBA. As such, under *Caddo*, the plain language of the CBA

governs this case. Therefore, because the CBA does not allow the incorporated documents to

remain in effect after the CBA's termination, the NPF Trust had no contractual authority to

assess the exit contribution on August 5, 2016.

Alternatively, the Court concludes that the October Amendment was not properly

incorporated into the CBA. The October Amendment explicitly states that it applies

"notwithstanding any language to the contrary in the collective bargaining agreement." Because

the October Amendment facially supersedes the terms of the CBA, applying it against Defendant

without Defendant's knowledge, awareness, or consent, would result in surprise and hardship.

*Pinnacle Min. Co.*, 785 F.3d at 114. At the time the CBA was formed, it is reasonable to accept

that the terms of the Trust Documents were binding on both parties because the documents were

readily available and reasonably identifiable in the CBA. *World Fuel Servs. Trading, DMCC*, 783 F.3d at 519; *see also DCI Signs*, No. 1:08-cv-15 at *7. Additionally, Defendant concedes that the CBA contemplates amendments to the Trust Documents. But these two facts do not lead to the conclusion that NPF may unilaterally impose material amendments on the employer without the employer's knowledge. *See Thompson v. Kings Entm't Co.*, 674 F. Supp. 1194, 1199 (E.D. Va. 1987) ("In the absence of special relations between the parties or other circumstances, the offeree need make no reply to the offer and his silence and inaction cannot be construed as assent.").

The missing link is some factual allegation that the amendment process provided an opportunity for Defendant to acknowledge and assent to the terms of the October Amendment. *See Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861 (4th Cir. 1994) ("[O]nly representations adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan."). The Amended Complaint simply alleges that "the NPF Trust was amended to add a new Section." Am. Compl. ¶ 44. It does not allege who amended the document or how it was amended. Nor does it allege that Defendant read, consented to, or was even aware of this Amendment. Moreover, it is not apparent that the NPF Trust had any specific process for amending its Trust Agreement. Without any knowledge of the Amendment, binding the Defendant to these terms would "run contrary to established principles of contract formation" which require a "mutual assent to be bound, usually demonstrated by offer and acceptance, and exchange of valuable consideration." *Toth v. Square D Co.*, 712 F. Supp. 1231, 1235 (D.S.C. 1989) (holding that unilateral changes to an employment contract did not bind the employee).

Relatedly, this complete lack of procedural or substantive limits on Plaintiffs' unilateral modification power (as pled) means that the clause itself is illusory.[10] *See Dumais*, 299 F.3d at 1219; *see also Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d at 93 n.5 (highlighting the procedural limitations that could render a unilateral modification clause enforceable). Under Plaintiffs' reading of the contract, there are no effective limits on the power to amend the binding provisions of the Trust Documents. Thus, each amendment could establish new rights or burdens on Defendant without any consideration in return. *See* Restatement (Second) of Contracts § 77 (discussing illusory promises).

Such a result is untenable. Consequently, the contractual principles discussed above dictate the conclusion that the October Amendment was not properly incorporated into the CBA and therefore is not binding on Defendant. Alternatively, even if it were properly incorporated, the amendment provision itself is illusory and invalid for that reason. Interpreting the CBA and Trust Documents otherwise would run contrary to fundamental canons of contractual interpretation and would indeed turn the Trust Agreement into a "moving and evolving target, the terms of which [are] unknown to Defendant." *Bd. of Trustees, Sheet Metal Workers' National Pension Fund v. DCI Signs & Awnings, Inc.*, (JCC), 2008 U.S. Dist. LEXIS 17115 at *7 (E.D. Va. 2008). Accordingly, Count II is hereby **DISMISSED** in full.

## IV. CONCLUSION

Plaintiffs seek to recover for three separate payments: (1) delinquent payments and audit fees from before January 2015; (2) delinquent payments and reporting after January 2015; and (3) an exit contribution. For the reasons discussed above, the motion to dismiss will be

---

[10] It may be the case that the Trust Documents themselves have some limitation on the modification power, but there is no such term cited in the Amended Complaint, and it is therefore not before the Court.

**GRANTED** for the first and third category of payments. The Motion will be **DENIED** for the

second category. An appropriate order shall issue.

_____
Liam O'Grady
United States District Judge

April 21, 2017
Alexandria, Virginia