**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

BOARD OF TRUSTEES, SHEET METAL )
WORKERS' NATIONAL PENSION FUND, et al., )
)
)
*Plaintiffs,* )
)                    Civil Action No. 1:16-cv-1613
v.                                      )                    Hon. Liam O'Grady
)
FOUR-C-AIRE, INC., )
)
*Defendant.* )

## MEMORANDUM OPINION

Before the Court are the parties' cross motions for summary judgment.  The motions

were fully briefed and the Court dispensed with oral argument because it would not aid the

decisional process.

### Background[1]

The sole remaining claim in this action is Count II of the Amended Complaint.  Count II

is a claim brought by Plaintiffs the Board of Trustees of the Sheet Metal Workers' National

Pension Fund ("the Fund"), for a delinquent exit contribution allegedly owed by Defendant Four-

C-Aire, Inc. ("Four-C-Aire").  The claim seeks to recover the delinquent exit contribution and

associated fees and damages.

#### *The Fund & the Trust Documents*

The Fund is a multiemployer pension plan and a jointly administered trust fund.  It is

governed by a "Trust Document."  In May of 2014, the governing Trust Document was the Sheet

Metal Workers' National Pension Fund Trust Document Amended and Restated as of January 1,

---

[1] Citations throughout this Memorandum Opinion refer to docket entries, rather than documents by title, for ease of reference.

2014 (the "2014 Trust Document"). Dkt. 92-4. The 2014 Trust Document authorized the trustees to impose a so-called "Exit Contribution" on participating employers that underwent a "Triggering Event" on or after January 1, 2003. *Id.* at 17. A Triggering Event occurred, *inter alia*, when a participating employer "ceases to have an obligation to contribute to the Fund . . . but is not required to pay any withdrawal liability under Title IV of ERISA as a result." *Id.*

The 2014 Trust Document was amended effective October 15, 2015. Dkt. 97-1 at 20 (minutes showing amendment); Dkt. 93-12 at 4-5 (Elkins deposition testimony confirming that fact). The next governing Trust Document was the Sheet Metal Workers' National Pension Fund Trust Document Amended and Restated as of December 1, 2015 (the "2015 Trust Document") included the amendment. Dkt. 92-5. The amendment, and the 2015 Trust Document, provide that an employer is liable for an Exit Contribution if it ceases to have an obligation to contribute to the NPF, and had an event of withdrawal under Title IV of ERISA as a result but was not required to pay withdrawal liability. *Id.* at 22.

The following is true of both the 2014 Trust Document and the 2015 Trust Document:

i. Both Trust Documents require participating employer Exit Contributions to be equal to the amount of the employer's contributions due for the 36-month period preceding the month in which the employer ceases to have an obligation to contribute. Dkt. 92-4 at 21; Dkt. 92-5 at 22.

ii. Exit Contributions are obligations incurred under the Trust Documents. The terms of both Trust Documents expressly provide that the obligation to pay an Exit Contribution is a type of contribution to the Fund which employers are obligated to make under the Trust Document, and that a failure to make such a contribution is therefore a delinquency. Dkt. 92-4 at 22; Dkt. 92-5 at 22.

2

iii. Exit Contributions are treated as delinquent contributions.  Both Trust

Documents provide that a failure to timely make an Exit Contribution constitutes

delinquency.  Dkt. 92-4 at 22; Dkt. 92-5 at 23.  They also require delinquent employers to

pay interest on delinquent contributions (at a rate of 0.0233% per day, compounded

daily), liquidated damages equal to the greater of interest on all delinquent contributions

at the above rate or twenty percent of the delinquent contributions owed upon the

commencement of litigation, and attorneys' fees and costs incurred in pursuit of the

delinquent amounts. Dkt. 92-4 at 20; Dkt. 92-5 at 20.

### The Collective Bargaining Agreement & Attendant Obligations

The Central New York Sheet Metal Contractors Association, Inc. (the "Contractors

Association"), an employer association, entered a collective bargaining agreement ("CBA") with

"Local 58,"[2] a labor organization.  Dkt. 92-1 at 12.  The CBA is comprised of three documents:

the Standard Form of Union Agreement ("Standard Form"), its Addenda, and the Wage and

Fringe Benefits Sheet ("Wage Sheet").[3] *See id.*  All three documents are executed by the

Contractors Association and Local 58.  *Id.* at 13, 15, 28, 30.  Only the Wage Sheet contains a

signature page for employers.  *Id.* at 15.

The CBA requires employer contributions to the Fund, and parties to the CBA agreed to

be bound by the Trust Documents.  First, while the Standard Form identifies certain trusts by

name and does not list the Fund, it nonetheless provides that signatory employers "agree to be

---

[2] The International Association of Sheet Metal, Air, Rail, and Transportation Workers f/k/a the Sheet Metal Workers' International Association, Local Union No. 58.

[3] Four-C-Aire purports to dispute this but the record does not support any other conclusion, and the citations Four-C-Aire provides do not stand for a proposition contrary to the Fund's position.  For example, Four-C-Aire states that the Fund has, in Case No. 1:15-cv-105, "described the 'Labor Agreement' in ECF No. 13 ¶2, as the 'Standard Form of Union Agreement, preceded by the Wage Sheet.'" Dkt. 103 at 2.  First, the citation is incorrect: that paragraph of that document does not include the quoted language.  Second, that paragraph does in fact describe the collective bargaining agreement, which is attached as an exhibit.  The exhibit includes the Standard Form of Union Agreement, the Wage Sheet, and the Addenda.

3

bound by . . . the separate agreements and declarations trusts of all other local or national programs to which it has been agreed that contributions will be made." *Id.* at 7. And in the same provision, employers "agree to be bound by any amendments to said trust agreements . . . ." *Id.*

Addendum 2(b) identifies the Fund. That provision states that employer's "contributions to the respective Funds that are set forth in this Agreement ( . . . Pension . . .), shall be made monthly . . . ." *Id.* at 19. It also explicitly incorporates the Trust Documents: "The parties of this Collective Bargaining Agreement hereby agree that the signing of this Agreement shall constitute an obligation to be bound by the terms and conditions, rules and regulations of said Agreements and Declarations of Trust as if said Agreements and Declarations of Trust were fully set forth herein and made a part hereof." *Id.* at 19.

Similarly, Addendum 9 identifies the fund when it requires that "employers shall make payments to the . . . National Pension Fund on behalf of all employees covered by this [CBA] . . . ." *Id.* at 22. Addendum 9 set employer contribution rates to the Fund at $6.00 per hour, effective May 1, 2011, but also allowed the rate to increase. *Id.*

The Wage Sheet notes the contribution rates required for the "National Pension" along with the timeframes to which the rates applied. Dkt. 92-2 at 1; *see also* Dkt. 92-1 at 14.

### Four-C-Aire's Union Membership & Compliance with the CBA

Between January and May of 2014, Local 58 representatives met with Aaron and Barbara Clothier, the President and Secretary-Treasurer of Four-C-Aire. At several meetings they discussed unionization and benefits of union membership. In May of 2014, at a meeting with Local 58 leadership, Barbara Clothier executed the Wage Sheet on behalf of Four-C-Aire. The following week, each Four-C-Aire employee and the Clothiers joined the union.

Four-C-Aire paid the wages required by the CBA as they were set out in the Wage Sheet and Addendum 1(a). It also made the required employer contributions to various funds, such as

4

the retirement and vacation funds, which its personnel participated in as covered employees. Further, Four-C-Aire also deducted and remitted union members' dues to Local 58 in accordance with the terms of the Standard Form and Addendum 25. Indeed, when Four-C-Aire submitted late remittance reports, or failed to submit those reports, the Fund notified them by correspondence 48 times between October, 2014 and April, 2016.

The Clothiers and their employees began accruing the benefits afforded by the CBA when they received pension benefits and service credits. The company, in turn, complied with other CBA terms such as working hours restrictions, and when Four-C-Aire required employees to carry personal tools in violation of the CBA, Local 58 sent a letter reminding the employer of its obligations.

The CBA requires, in Addenda 2(b) and 33, that employers comply with the Fund's payroll audits. In June of 2015, the Fund notified Four-C-Aire that pursuant to federal law and the CBA, it was authorizing an accountancy firm to conduct a compliance payroll audit. When that firm subsequently contacted Four-C-Aire for payroll records, Four-C-Aire provided the requested records.

On November 24, 2015, Four-C-Aire sent the Contractors Association a letter and copied Local 58. The letter purported to constitute notice that Four-C-Aire planned to "withdraw [] membership from the Association" as well as "authorization for the Association to bargain on [Four-C-Aire's] behalf" upon the CBA's expiration date, April 30, 2016. Dkt. 93-6. Four-C-Aire sent a similar letter to Local 58 on the same day which advised the union that it was withdrawing from the Contractors Association, and also that it would not renew the CBA upon its expiration, April 30, 2016. Dkt. 93-7.

After April 30, 2016, Four-C-Aire continued to perform covered work within Local 58's jurisdiction.  The company also ceased having any obligation to contribute to the Fund as of May 1, 2016.  The Fund assessed an exit contribution against Four-C-Aire on August 5, 2016 in the amount of $97,601.01, pursuant to the Trust Documents.

Four-C-Aire has not paid the exit contribution.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party moving for summary judgment has the initial burden of establishing the basis for its motion and identifying the evidence which demonstrates the absence of a genuine issue of material fact.  *Id.*  Once the moving party satisfies its initial burden, the opposing party may show by means of affidavits or other verified evidence that a genuine dispute of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

While the facts and all justifiable inferences should be considered in the light most favorable to the nonmovant, *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013), courts must not resolve disputed facts, weigh the evidence, or make credibility determinations, *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)).  When considering cross-motions for summary judgment, courts consider each motion separately and on

6

its own merits. *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014). "In considering each motion, [courts] 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Id.* (quoting *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003)).

"[T]he mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012) (citation omitted). "Mere speculation by the non-movant cannot create a genuine issue of material fact." *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (*Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir. 2001)). Where the nonmoving party fails to make a showing on an essential element of the claim for which he bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322-23.

<u>Discussion</u>

The Board brought this action under sections 502 and 515 of the Employee Retirement Security Act of 1974 ("ERISA"), as amended, 29 U.S.C §§ 1132 and 1145. Section 515 creates a "cause of action permitting multiemployer plans to collect contributions from employers so long as the plan is able to establish an obligation to contribute under the terms of the plan's governing documents or the CBA." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 139 (4th Cir. 2019). The statute provides:

7

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of the plan or under the terms of a [CBA] shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement

29 U.S.C. § 1145. It empowers a plan to "enforce, *as written*, the contribution requirements found in the controlling documents . . . Consequently, an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement." *Four-C-Aire*, 929 F.3d at 139 (quoting *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997)). Thus, to succeed on its claim, the Fund must show that Four-C-Aire was obligated to make contributions under the terms of the CBA or the Trust Documents, and failed to do so.

### *Four-C-Aire Is Obligated to Make Exit Contributions*

Four-C-Aire bound itself the Trust Documents through the CBA because it signed a "me-too" agreement and in any case adopted the CBA by conduct.

A "'me-too agreement,' [] is a contract where an employer agrees to be bound by the terms of a CBA negotiated by a multiemployer association and local union." *Four-C-Aire*, 929 F.3d at 142 n.4 (citing *Carpenters Health v. Mgmt. Res. Sys. Inc.*, 837 F.3d 378, 382–83 (3d Cir. 2016). The signatory to a me-too agreement is assured of numerous benefits:

> (1) it will not be subject to a contract containing more onerous conditions than are applicable to its competitors, (2) it will obtain whatever protections or advantages the industry collective bargaining agreement provides other employers, (3) it will be saved the cost of expensive negotiations, and most pertinent here, (4) it will be covered by an agreement whenever the rest of the industry is covered and not subject to an agreement whenever the rest of the industry is not

*Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Tr. Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir. 1985). Such agreements "allow[] individual

8

employers to benefit from the terms of an association's CBAs without actually having to get involved in the collective bargaining process." *Carpenters Health*, 837 F.3d at 382–83.[4]

The Wage Sheet that Four-C-Aire executed is of the type "commonly referred to by labor and management representatives as a 'me-too agreement.'" *Conquer Cartage Co.*, 753 F.2d at 1514; *see also Four-C-Aire,* 929 F.3d at 142, 142 n.4 (noting that Four-C-Aire signed a me-too agreement which bound it to the CBA). Four-C-Aire availed itself of each of the benefits of me-too agreements, and did not actually need to engage in the collective bargaining process over terms, or have to incur the costs which accompany such bargaining. And while me-too agreements incorporate other documents which the signatory did not participate in drafting, "[t]here is no distinction between actual and 'me-too' signatories to a CBA." *Carpenters Health*, 837 F.3d at 382. Accordingly, Four-C-Aire's execution of the me-too agreement bound it to the CBA.

Four-C-Aire argues that the Wage Sheet was not a me-too agreement. This argument fails because as noted above, similar wage sheets identified in controlling cases are commonly known to be me-too agreements, which are both "common and generally enforceable." *Id.*

Despite the Fourth Circuit's explanation to the contrary, Four-C-Aire argues the text of the Wage Sheet here, which proclaims "[t]his is merely a wage and fringe rate sheet furnished to all contractors for immediate guidance," shows it cannot be a me-too agreement. But the language of the Wage Sheet does not support Four-C-Aire's argument. The word "merely" does not distinguish the Wage Sheet as an independent contract. Rather, because "merely" is a comparative word, its use signifies that the Wage Sheet is an incomplete subpart of the greater

---

[4] *See also Conquer Cartage Co.*, 753 F.2d at 1518 ("the basic purpose of a 'me-too agreement' is to allow independent, usually smaller, employers to obtain all the benefits of the master collective bargaining agreement that is negotiated by the principal employers in the industry without having to participate in the industry negotiations, or to engage in separate negotiations.").

whole.  The cited language also reveals the Wage Sheet's purpose is not to identify all the relevant contract terms, but to "furnish[] . . . immediate guidance," which contemplates more comprehensive guidance which is not immediately available within the Wage Sheet. Furthermore, to the extent that Four-C-Aire bases its argument on its own unilateral mistake when contracting with Local 58, that is not a cognizable defense against the Fund's Section 515 action. *Ralph's Grocery Co.,* 118 F.3d at 1021-22; *accord Four-C-Aire*, 929 F.3d at 140 (discussing the inapplicability of certain common law contract defenses in cases such as this).

Even if the Wage Sheet were not a me-too agreement, Four-C-Aire adopted the CBA by conduct.  In the Fourth Circuit, "a collective bargaining agreement can be adopted by conduct manifesting an intention to be bound by its terms." *Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 448 (4th Cir. 2015).

In *Plumbing Servs.*, the Fourth Circuit considered whether a company ("PSI") qualified as an "employer," because ERISA defines employers as those which have acted "in relation to an employee benefit plan." *Id.* at 446-47 (quoting 29 U.S.C. § 1002(5)).  PSI never signed the collective bargaining agreement but, in 1998, executed a Letter of Assent, a me-too agreement. *Id.* at 441.  The Letter of Assent included an obligation to "make contributions to the . . . National Pension Fund." *Id.*  PSI began making contributions to the Pension Fund in 1998, and it did so for years. *Id.*  Before the Fourth Circuit, PSI argued that it had no obligation to make further contributions to the Pension Fund though the master labor agreement required them, because according to PSI, it was never bound to that agreement. *Id.* at 442, 447.

The Fourth Circuit disagreed.  First, it found the Letter of Assent, like the Wage Sheet here, was sufficient to bind PSI to contribute to the Pension Fund pursuant to the collective bargaining agreement. *Id.* at 447.  But the court also found that "even if the Letter of Assent

10

alone did not bind PSI to make future contributions to the Fund, [PSI's] conduct certainly did." *Id.* at 448. While "[t]he most obvious manifestation of PSI's intent to be bound . . . was its decision to sign the Letter of Assent," its intent was "also made unmistakably clear by the fact that [it] made contributions . . . in accordance with the governing collective bargaining agreements for thirteen years." *Id.*

So too here. As in that case, Four-C-Aire made contributions to the plaintiff Fund in accordance with a particular CBA. Four-C-Aire remitted contributions to the Fund (along with the other funds required by the contract) between May of 2014 and April of 2016 on behalf of its covered union employees pursuant to the CBA. This conduct is sufficient to show that Four-C-Aire adopted the CBA and intended to be bound by it.

In addition to nearly two years of contributions through remittances, Four-C-Aire demonstrated its intent to be bound through numerous other actions. For example, Four-C-Aire complied with the Fund's payroll audit, used the Fund's online payment system, and responded to Local 58's demand letters for past due remittances from the Health & Welfare Fund and the Fund regarding outstanding remittance reports and contributions.

Four-C-Aire argues that its actions did not manifest an intent to be bound by pointing to various interactions with Local 58. As a threshold matter, this argument fails because employers are not permitted, in § 515 actions, "to raise defenses that relate to claims the employer may have against the union." *Ralph's Grocery Co.*, 118 F.3d at 1021. Moreover, mere isolated failures to comply with a CBA do not show an intent not to be bound as the contracts contain enforcement mechanisms.

In any case, the actions and interactions that Four-C-Aire identifies do not demonstrate an intent, or lack thereof. Four-C-Aire points to the following: its failure to post a bond pursuant to

11

the CBA, failure to follow mandatory online reporting, failure to use a hiring hall, and failure to follow union work rules. These failures do not create a genuine dispute of material fact because first, the CBA's bond requirement is waivable by Local 58, Dkt. 92-1 at 20, and second, Four-C-Aire only initially failed to use online reporting mechanisms before indisputably changing course and complying with the mandatory system. Third, any failure to use a hiring hall is merely failure to take advantage of a benefit afforded to signatory employers, and only then if the employer sought to add employees. And finally, fourth, while Four-C-Aire allowed employees to use personal tools, Local 58 sent Four-C-Aire a letter providing notification that doing so was contrary to the contract.

Thus, there is no dispute of material fact that Four-C-Aire bound itself to the CBA. It did so by both executing the me-too agreement and by manifesting an intent to be bound by its conduct.

### The CBA Incorporates the Trust Documents

There is no genuine dispute regarding incorporation of the Trust Documents into the CBA. Having bound itself to the CBA, Four-C-Aire bound itself to the Trust Documents because they are properly incorporated therein. Since Four-C-Aire was a party to the CBA, it "clearly agreed . . . to abide by the contribution requirements set forth in the Trust Documents and any amendments to those Documents." *Four-C-Aire*, 929 F.3d at 147.

The language of the CBA is plain. The Standard Form explicitly provides that signatories agree to be bound by "the separate agreements and declarations of trusts of all other local or national programs to which it is has been agreed that contributions will be made." Dkt. 92-1 at 7. And Four-C-Aire agreed, in signing the Wage Sheet, to contribute to the Fund.

Moreover, the words "separate" and "other" in that provision clearly and unquestionably indicate that the named trusts identified by name in the Standard Form are not the only trusts which are incorporated. Indeed, the CBA does include obligations to other trusts named elsewhere in the document: the Fund is expressly named in the addenda and therefore incorporated into the earlier provision of the Standard Form.

First, Addendum 2(b), like the Wage Sheet itself, identifies the "Pension" fund. *Id.* at 19 ("contributions to the respective Funds that are set forth in this Agreement ( . . . Pension . . .), shall be made monthly . . . ." ). And, even more clearly, Addendum 9 identifies the "National Pension Fund." *Id.* at 22. Specifically, it states "employers shall make payments to . . . the National Pension Fund" at a rate, initially set at $6.00/hour, for each employee covered by agreement. *Id.* By signing the me-too agreement and otherwise adopting the CBA by conduct, Four-C-Aire agreed to make contributions to the Fund. And as a result of that agreement and pursuant to the CBA, Four-C-Aire agreed to be bound by the Fund's governing documents: the Trust Documents.

The CBA explicitly incorporates the Trust Documents: "The parties of this Collective Bargaining Agreement hereby agree that the signing of this Agreement shall constitute an obligation to be bound by the terms and conditions, rules and regulations of said Agreements and Declarations of Trust as if said Agreements and Declarations of Trust were fully set forth herein and made a part hereof." *Id.* at 19. The Fund is named in the addenda, a part of the CBA. Accordingly, the Trust Documents are incorporated into the CBA. The doctrine of *expression unius est exclusion alterius* is not implicated and Four-C-Aire's other arguments regarding improper incorporation fail.

13

### *The Trust Documents Impose an Exit Contribution Obligation*

"[U]nder § 515, the CBA and Trust Documents must be interpreted so that Four-C-Aire is held to the requirements set forth by the plain language of those Documents." *Four-C-Aire*, 929 F.3d at 146. Section 515 allows "a multiemployer plan [to] enforce, as written, the contribution requirements found in the controlling documents." *Ralph's Grocery*, 118 F.3d at 1021. Here, the controlling documents impose an exit contribution obligation upon certain employers that cease to otherwise have a contribution obligation.

The 2014 Trust Document provides that the Trustees may impose an exit contribution when a participating employer "ceases to have an obligation to contribute to the Fund . . . but is not required to pay any withdrawal liability under Title IV of ERISA as a result." Dkt. 92-4 at 21. That Trust Document was amended, effective October 15, 2015, to clarify that the "Trustees impose" such an exit contribution, and that by agreeing to contribute or continuing to be obligated to contribute to the Fund, employers agree to the exit contribution. Dkt. 97-1 at 20 (minutes showing amendment); Dkt. 93-12 at 4-5 (Elkins deposition testimony confirming that fact). The 2015 Trust Document imposes the same obligation: participating employers "shall pay an Exit Contribution after the expiration of [a CBA] if [they] ceased to have an obligation to contribute to the Fund . . . and [] did not enter into a successor" CBA. Dkt. 92-5 at 22.

Thus, "the plain terms of the Trust Documents required Four-C-Aire to pay an exit contribution upon expiration of the CBA (if no successor CBA had been reached), even prior to the Amendment." *Four-C-Aire*, 929 F.3d at 148. The terms of both governing documents impose an exit contribution upon participating employers which (1) cease to have a contribution obligation to the Fund, and (2) had an event of withdrawal under ERISA, and (3) did not have to pay any withdrawal liability under ERISA. Four-C-Aire is such an employer.

14

There is no dispute that Four-C-Aire ceased to have an ongoing obligation to contribute to the Fund as a result of the CBA's April 30, 2016 expiration and Four-C-Aire's nonrenewal. Thus, the first requirement is satisfied.

There is also no dispute that Four-C-Aire continued, after April 30, 2016, to engage in the same type of covered work within the CBA's jurisdiction. An event of withdrawal for an employer in the building and construction industry, such as Four-C-Aire, occurs when the employer ceases to have a contribution obligation under the plan and yet the same employer continues to perform work of the type for which contributions were previously required, in the jurisdiction of the collective bargaining agreement. 29 U.S.C. § 1383(b)(2). Thus, the second requirement is satisfied.

Finally, there is no dispute that Four-C-Aire's withdrawal liability fell under the "De minimis rule" of 29 U.S.C. § 1389. Thus, Four-C-Aire did not have to pay any ERISA withdrawal liability.

Therefore, pursuant to the Fund's governing documents, Four-C-Aire is liable for an exit contribution.

### The Exit Contribution Survives Expiration of the CBA

Both the 2014 and 2015 Trust Documents impose the same exit contribution liability upon Four-C-Aire. That exit contribution liability survived the expiration of the CBA for two reasons. First, the duty to pay, which was created by the Trust Documents, survived expiration of the CBA. The plain terms of exit contribution requirement provide for payment "if three criteria were met: (1) [Four-C-Aire] ceased to have an obligation to contribute to the Fund, and (2) as a result of the cessation of its obligation to contribute, it had an event of withdrawal under Title IV of ERISA, but (3) did not have to pay a statutorily mandated withdrawal liability."

15

*Four-C-Aire*, 929 F.3d at 148.  The mere fact that the exit contribution is provided for in the Trust Documents, rather than the CBA, does not alter this analysis because the Trust Documents were incorporated, as noted above.  Second, the CBA's incorporation of the Trust Documents specifically provides that employers are bound, not only by the Trust Documents at the time the CBA is executed, but also "by any amendments to said trust agreements."  Dkt. 92-1 at 7.  The exit contributions survive the CBA's expiration because multiemployer plans are empowered by § 515 to enforce contribution requirements found in the controlling documents of trusts "as written."  *Ralph's Grocery*, 118 F.3d at 1021; *accord Four-C-Aire*, 929 F.3d at 139.  Here, the exit contribution requirements are written to survive CBA expiration, and indeed, are expressly connected to withdrawal.  *See Four-C-Aire*, 929 F.3d at 148 n.16.

### The Fund Complies with the Relevant Statutes

Four-C-Aire raises numerous arguments regarding the Fund's purported statutory infirmities.  Each argument fails because the Fund does comply with requirements set forth in the Labor Management Relations Act ("LMRA").

Four-C-Aire primarily argues that it never signed a "written agreement" specifying "the detailed basis on which such payments are to be made," and that as a result, it is statutorily prohibited from contributing the Fund.  29 U.S.C. § 186(c)(5)(B).  As an initial matter, there is no dispute that Four-C-Aire signed the Wage Sheet which, as discussed above, was a me-too agreement.  Therefore there was, in fact, a written agreement which specified the detailed basis on which payments were to be made.  Having signed the me-too agreement, Four-C-Aire was a party to the CBA which incorporates the Trust Documents, both of which set forth a specific basis upon which payments to the Fund were to be made.  The fact that Four-C-Aire did not sign the Standard Form or Addenda of the CBA is inconsequential.  In the Fourth Circuit, a me-too

agreement in conjunction with conduct evidencing an intent to be bound is sufficient. *Plumbing Services,* 791 F.3d at 448.

In addition, Four-C-Aire claims that an exit contribution cannot be assessed against it because the collected funds will not inure to the sole and exclusive benefit of Four-C-Aire's employees. Section 302(c)(5) of the LMRA, codified at 29 U.S.C. § 186(c)(5) requires contributions to a trust such as the Fund to be for "the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)." Four-C-Aire argues that an exit contribution is not authorized by the statute because Four-C-Aire's employees, and their families and dependents, were no longer covered by the Fund at the time the exit contribution was assessed.

This argument is flawed. Here, the Fund is a multiemployer plan, and thus benefits may accrue to those employees of other employers. *Id.* The result of a multiemployer plan is to pool all plan assets in a way which inures to the sole and exclusive benefit of the employees of all participating employers. *See Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 638 (1993) ("An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone."). In addition, the exit contribution will in fact inure to Four-C-Aire's employees' benefit based on their participation in the plan, and the service credits they earned and may continue to earn in the future. *See id.* (explaining ways employees of a withdrawn employer can continue to receive a pension plan's benefits).

Four-C-Aire also argues, essentially, that the Trust Documents are invalid and cannot impose an exit contribution because the LMRA "not only requires an equal number of trustees

from labor and management, but the vote of each bloc must be unanimous." Dkt. 96 at 19 (internal citation omitted). But neither the statute nor the cases cited by Four-C-Aire impose that requirement on the Board, and the Fund's minutes and amendments show that the Board did in fact emplace the exit contribution requirements into the Trust Documents.

Another argument is that Four-C-Aire's November 20, 2015 repudiation of the CBA terminated its exit contribution obligation. Certain types of CBAs, "pre-hire" agreements under § 8(f) of the LMRA, 29 U.S.C. § 158(f), are "voidable by repudiation." *Indus. TurnAround Corp. v. N.L.R.B.*, 115 F.3d 248, 255 (4th Cir. 1997). Here, Four-C-Aire claims that its right to repudiate stems from the fact that it entered into a prehire agreement, and that upon repudiation, its contractual obligations terminated.

This argument fails because, by signing the me-too agreement and otherwise adopting the CBA by conduct, Four-C-Aire became bound to the entirety of the CBA. The CBA is clear that a signatory employer "waives any right . ... to repudiate this Agreement." Dkt. 92-1 at 13. Accordingly, Four-C-Aire bargained away its ability to unilaterally repudiate.

In any case, repudiation would not affect Four-C-Aire's exit contribution obligation. Four-C-Aire relies upon the Supreme Court's decision in *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) for the proposition that its contractual obligations, including any obligation to pay the exit contribution, terminated upon repudiation. But "to the extent *M & G Polymers* is applicable, the Supreme Court there recognized that the parties to a CBA could explicitly agree to extend specific obligations beyond the CBA's expiration." *Four-C-Aire*, 929 F.3d at 149 n. 18. "And that is exactly what occurred here: the Trust Documents, which were expressly incorporated into the CBA, unambiguously provided that an employer's obligation to pay the exit contribution survived the expiration of the CBA." *Id.* at 149.

18

Next, Four-C-Aire argues an exit contribution under the Trust Documents is not a "contribution" which may be collected under § 515 of ERISA. This argument has already been rejected by the Fourth Circuit. "An action to compel an employer to pay overdue withdrawal liability is treated the same as an action to collect delinquent contributions." *Plumbing Servs.,* 791 F.3d at 445. And, with some restrictions, plans may determine their own method of assessing withdrawal contributions. *See* 19 U.S.C. § 1391(c)(1). Thus, "exit contributions [] constitute a contribution under ERISA § 515." *Four-C-Aire*, 929 F.3d at 147 n.15.

Similarly, Four-C-Aire argues the exit contribution may not be collected pursuant to ERISA because the amount was a contingent liability which was not certain to accrue. But § 515 authorizes multiemployer plans to enforce an employer's obligations to contribute under not just a CBA, but alternatively "under the terms of the plan." 29 U.S.C. § 1145. And here, the Trust Documents provide for exit contributions to be treated as delinquent contributions. Therefore, this argument fails.

In addition, Four-C-Aire argues it cannot be subject to the obligations imposed by the Trust Documents based on "traditional principles of contract law." Dkt. 96 at 24-28. Specifically, the employer argues the Trust Document was not properly identified or readily available for review, that it did not assent to the Trust Document, that the Trustees' right to amend the Trust Document makes any agreement illusory, and that there was no consideration for the amendment to the Trust Document. But such rules of contract law apply in cases such as this "only when they do not conflict with federal labor law." *Ralph's Grocery*, 118 F.3d at 1025; *accord Four-C-Aire*, 929 F.3d at 139. And "§ 515—as a statement of federal labor policy—bestows favored status on multiemployer plans" which bars the applicability of certain common law defenses. *Four-C-Aire*, 929 F.3d at 139.

19

The defenses raised here are not supported. As discussed above, the Trust Document is properly incorporated into the CBA in part because the Fund is identified therein, and the CBA refers to its governing documents. For the same reasons, Four-C-Aire assented to its obligations. The Trust Document, moreover, was readily available because ERISA makes it available upon request. *See* 29 U.S.C. § 1021(k). Four-C-Aire's argument that the Trust Document's susceptibility to amendment created an illusory contract is of no import because the Trust Document, prior to any amendment, imposed an exit contribution obligation. *See Four-C-Aire*, 929 F.3d at 148-49. For the same reason, to the extent Four-C-Aire argues there was no consideration for the amendment to the 2015 Trust Document, that argument fails. Furthermore, Four-C-Aire received consideration in the form of participating employees' pension credits in exchange for post-amendment employer contributions.

Finally, Four-C-Aire asserts that fraud in the execution bars enforcement of the exit contribution requirement incorporated into the CBA. This affirmative defense was not pled, as required by the Federal Rules, and is therefore waived if it causes prejudice or unfair surprise. The Court finds that the defense was waived and also that it lacks merit.

While § 515 strengthened the position of multiemployer plans and prevented employers from raising certain defenses, "multiemployer funds are not permitted to 'enforce a nonexistent contractual obligation.'" *Ralph's Grocery*, 118 F.3d at 1022 (quoting *Teamsters Industrial Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993). Thus, one defense to a § 515 enforcement action is that there was "fraud in the execution of the collective bargaining agreement." *Nat'l Elec. Ben. Fund v. James Copeland Elec. Const., LLC*, 2011 WL 2181490, at *3 (D. Md. June 2, 2011). "Fraud in the execution results where 'because of a misrepresentation as to the character or essential terms of a proposed contract, a party does

not know or have reasonable opportunity to know of its character or essential terms.'" *Shaffer v. Nw. Mut. Life Ins. Co.*, 2007 WL 38853, at *5 (N.D.W. Va. Jan. 5, 2007) (quoting Restatement (Second) of Contracts § 163 cmt. a (1981)). In other words, "where there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'" *Trustees of ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*, 127 F. Supp. 2d 475, 480 (S.D.N.Y. 2001) (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28 (2d Cir. 1997)); *accord James Copeland Elec. Const.*, 2011 WL 2181490, at *3; *see also Trustees of Nat'l Asbestos Workers Med. Fund v. Gamble Insulation Co.*, 2006 WL 8456775, at *3 (D. Md. Jan. 4, 2006) ("A defense of fraud in the execution requires the employer to establish excusable ignorance of the contents of the written signing.").

Four-C-Aire's argument, that fraud in the execution applies here, fails because there is no evidence which shows that Four-C-Aire lacked a reasonable opportunity to know of the CBA. As discussed above, the CBA explicitly notes it is "merely" an incomplete portion of the whole, and Four-C-Aire was engaged in unionization discussions with Local 58 for a period of months. Accordingly, Four-C-Aire has not established excusable ignorance, and its argument is rejected.

### Four-C-Aire's Liability

The Trust Documents each set forth the method by which exit contributions are calculated. Dkt. 92-4 at 21-22; Dkt. 92-5 at 22-23. Under both documents, the amount of an exit contribution is the equal to the contributions due for the thirty-six month period preceding the event triggering exit contribution liability. The Fund assessed an exit contribution in the amount of $97,601.01 against Four-C-Aire pursuant to the method identified in the plan's governing documents. Dkt. 92-14. There is no dispute that Four-C-Aire's reported hours, upon which the

21

exit contribution calculation is based, were accurate.  Accordingly, Four-C-Aire is liable for the $97,601.01 exit contribution.

Furthermore, in actions such as this one, brought by fiduciaries on behalf of a plan to enforce § 1145, courts "shall award the plan" amounts in addition to the delinquent contribution. 29 U.S.C. § 1132(g)(2).  Specifically, the plan must be awarded interest on the unpaid contribution, which "shall be determined [] using the rate provided under the plan."  *Id.*  And moreover, the plan must be awarded an amount which is equal to the greater of the interest or liquidated damages provided under the plan's terms, not to exceed 20% of the unpaid contribution.  *Id.*

The governing documents of the plan here provide for delinquent contributions to bear an interest rate of 0.0233% per day (an effective annual interest rate of 8.5045%), compounded daily, from the original due date.  Dkt. 92-4 at 20; Dkt. 92-5 at 20.  And the governing documents provide for liquidated damages to be the greater of, either, 20% of the delinquent contribution, or the amount of interest owed.  Here, the greater amount is the amount of interest owed, which was $34,678.53 on April 17, 2020.  Thus, as of that date, Four-C-Aire was liable for the exit contribution ($97,601.01), the interest ($34,678.53), and liquidated damages in an amount equal to the interest ($34.678.53), or $166,958.07.  Furthermore, both the CBA and the incorporated Trust Documents provide that the Fund is entitled to recover attorneys' fees incurred in collecting delinquent contributions.  The CBA provides in Addendum 2(b) that "any employer becoming delinquent in . . . paying contributions . . . shall . . . pay . . . fifteen percent (15%) of the amount of the delinquency for any necessary legal services of the Fund's attorneys." Dkt. 92-1 at 19. The Trust Documents, incorporated into the CBA, state that "the delinquent Employer shall [] be liable for reasonable attorneys' fees and for all reasonable costs

22

incurred in collection." Dkt. 92-4 at 20; Dkt. 92-5 at 20. The terms governing liability for attorneys' fees are, therefore, conflicting. But the Fourth Circuit has emphasized that "where two CBA provisions conflict, the provision imposing 'uniform plan participation requirements' governs." *Four-C-Aire*, 929 F.3d at 141 (citing *Ralph's Grocery*, 118 F.3d at 1025). Because the Trust Documents may be incorporated into numerous CBAs, the provision therein governs because enforcement of that provision furthers uniform plan participation. Moreover, in actions brought under § 1145, courts "shall award . . . reasonable attorney's fees and costs . . . to be paid by the defendant. 29 U.S.C. § 1132(g)(2). Accordingly, the Fund is entitled to reasonable attorneys' fees.

### Conclusion

In conclusion, there is no genuine dispute of material fact and Plaintiff, the Fund, is entitled to judgment as a matter of law on Count II. Accordingly, Plaintiff's motion for summary judgment, Dkt. 90, is hereby **GRANTED**, and Defendant's motion for summary judgment, Dkt. 95, is hereby **DENIED**.

It is **SO ORDERED**.


September 10, 2020
Alexandria, Virginia

Liam O'Grady
United States District Judge